UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

KELLY BEHLMAN,

                Plaintiff,

        v.                                              Case No. 19-C-1147

ANDREW M. SAUL,
Commissioner of Social Security,

                Defendant.
_____

**DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION**
_____

Plaintiff Kelly Behlman filed this action for judicial review of a decision by the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Behlman contends that the decision of the administrative law judge (ALJ) is flawed and requires remand because the ALJ failed to properly consider Dr. Vicente's medical source statement; neither the residual functional capacity (RFC) assessment nor the hypothetical provided to the vocational expert (VE) contained appropriate limitations to accommodate Behlman's moderate limitations in concentration, persistence, and pace (CPP); and the Appeals Council failed to consider new and material evidence. For the reasons that follow, the Commissioner's decision will be affirmed.

## BACKGROUND

Behlman filed an application for disability insurance benefits on May 25, 2016, alleging disability beginning November 25, 2015. R. 238–44. She subsequently filed an application for supplemental security income (SSI) benefits on June 10, 2016. R. 245–51. She listed depression and anxiety as the conditions that limited her ability to work. R. 269. After her applications were

denied initially and on reconsideration, Behlman requested a hearing before an ALJ. ALJ Gary Freyberg conducted a hearing on August 2, 2018. Behlman, who was represented by counsel, and a VE testified. R. 50–87.

At the time of the hearing, Behlman was 48 years old and lived alone in a duplex. R. 61–62. She graduated high school and had worked at 4imprint where she proofed orders before they went to production. R. 61, 64. She was terminated from that position for missing too much work. R. 65. She then operated a bar for one year. R. 66. Behlman testified that she was absent from work due to her depression and anxiety and that she has trouble concentrating and adapting to change. R. 63. She reported suffering from depression and anxiety since 2005. *Id.* Behlman stated that she has problems getting out of bed to start her day at least once a week and that she does not like being around people or in large groups. R. 69, 71. She has a panic attack once a week that lasts 15 to 45 minutes. R. 72. Plaintiff testified that she spends her days sleeping and watching television. R. 75.

In a thirteen-page decision dated November 8, 2018, the ALJ concluded Behlman was not disabled. R. 33–45. Following the Agency's sequential evaluation process, the ALJ found at step one that Behlman met the insured status requirements of the Social Security Act through December 31, 2020, and had not engaged in substantial gainful activity since November 25, 2015, the alleged onset date. R. 36. At step two, the ALJ determined Behlman had the following severe impairments: affective disorders and anxiety disorders. *Id.* At step three, the ALJ found that Behlman did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

After reviewing the record, the ALJ determined Behlman had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations:

> the claimant must avoid all exposure to unprotected heights. She is limited to understanding, remembering, and carrying out no more than simple instructions. The claimant is allowed to be off task ten percent of the day in addition to regularly scheduled breaks. She must be employed in a low stress job, defined as having only occasional decision making required and only occasional changes in the work setting. She is limited to work where there is no production rate or pace work, such as an assembly line. She is limited to only occasional contact with the public, coworkers, and supervisors.

R. 38. With these limitations, the ALJ found at step four that Behlman was unable to perform any past relevant work as a data entry clerk and secretary. R. 43. He nevertheless concluded at step five that there are jobs that exist in significant numbers in the national economy that Behlman can perform, including hand packager, product assembler, and electronics worker. R. 44. Based on these findings, the ALJ concluded Behlman has not been under a disability, as defined in the Social Security Act, from November 25, 2015, through the date of the decision. *Id.* The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Behlman's request for review. Thereafter, Behlman commenced this action for judicial review.

## LEGAL STANDARD

A claimant is entitled to disability benefits under Title II of the Social Security Act if she became disabled before the date she was last insured. 42 U.S.C. § 423(a)(1). To receive SSI under Title XVI of the Social Security Act, a claimant must be disabled and have limited means. 42 U.S.C. §§ 1381(a), 1382. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs exist in significant numbers in the national

economy that the claimant can perform shifts to the SSA at the fifth step in the sequential process, the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense, given the fact that the majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because, for many physical and mental impairments, objective evidence does not exist that would allow one to distinguish those impairments that render a person incapable of full-time work from those that make such employment merely more difficult. Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of the Social Security Administration. Judicial review of the decisions of the Commissioner, like judicial review of all administrative agencies, is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the burden of proof. In other words, a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

Nor does the test require that the Commissioner cite conclusive evidence excluding any possibility that the claimant is unable to work. Such evidence, in the cases that go to hearing, is seldom, if ever, available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative

4

decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court recently reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and his conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Evaluation of Medical Opinion Evidence

Behlman asserts that the ALJ's decision must be remanded because the ALJ failed to properly evaluate the medical source statement of Dr. Vicente, her treating physician. Generally, the ALJ must give "controlling weight" to the medical opinions of a treating physician on the nature and severity of an impairment if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence." *Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019); 20 C.F.R. § 416.927(c)(2); SSR 96-2p. If the ALJ decides to give lesser weight to a treating physician's opinion, he must articulate "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). Stated differently, although an ALJ is not required to give the treating physician's opinion controlling weight, he is still required to provide a "sound explanation for his decision to reject it." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). "If the ALJ does not give the treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Dr. Vicente completed a medical source statement for Behlman in June 2017. R. 364–69. In completing the form, Dr. Vicente checked boxes indicating Behlman had the following

symptoms: poor memory, appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, recent panic attacks, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, feelings of guilt/worthlessness, social withdrawal or isolation, decreased energy, generalized persistent anxiety, hostility and irritability, difficulty thinking or concentrating, and suicidal ideation or attempts. R. 364–65. He noted that, although Behlman did not have suicide attempts, she is "often hopeless." R. 365. He also checked boxes that Behlman's ability to remember work-like procedures; maintain attention for two-hour segments; maintain regular attendance and be punctual within customary, usually strict, tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along well with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; and deal with normal work stress was "poor or none." R. 367–68. He noted that Behlman also had impaired concentration. R. 368.

Dr. Vicente opined that Behlman had marked limitations in activities of daily living and in maintaining social function. He also opined that Behlman would have frequent deficiencies of concentration, persistence, or pace resulting in her failure to complete tasks in a timely manner. *Id.* Dr. Vicente further opined that Behlman would have repeated (3 or more) episodes of deterioration or decompensation in work or work-like settings which cause her to withdraw from that situation or to experience exacerbations of signs and symptoms. R. 369. Dr. Vicente opined that Behlman's impairments or treatment would cause her to be absent from work more than twice a month. R. 366.

7

The ALJ afforded no weight to Dr. Vicente's opinion. He explained

> While the claimant has been found to be somewhat limited, the record simply does not support such extreme limitations. Dr. Vicente's findings appear to rely on self-report by the claimant. While the claimant reported numerous symptoms, mental status examinations were consistently fairly normal. The claimant was found to be in mild distress with mild psychomotor agitation, and her mood was found to be dysthymic and anxious. However, she was also noted to be pleasant and cooperative with good eye contact. She had good insight and judgment. Her thought content was without psychotic symptoms or suicidal ideation. She had no racing thoughts or loosening of associations. Her thought processes were logical and goal directed. Her speech was fluent and spontaneous with a normal rate, tone, and volume (Exhibit 6F/12). Additionally, these findings are not consistent with the claimant's activities, including her acting as a caregiver for a friend [on] an extended trip to a foreign country (Exhibit 6F and Hearing Testimony). Therefore, these opinions are granted no weight.

R. 43.

Behlman asserts that Dr. Vicente was entitled to rely on her self-reports in forming his opinion. The Seventh Circuit found error when an ALJ had excluded a mental health provider's opinion for the reason that it was based on the claimant's self-report of symptoms in *Mischler v. Berryhill*, 766 F. App'x 369 (7th Cir. 2019). The court explained

> A psychiatrist does not merely transcribe a patient's subjective statements. Mental-health assessments normally are based on what the patient says, but only after the doctor assesses those complaints through the objective lens of her professional expertise. Further, the trained physician, not the ALJ, is better positioned to discern "true" complaints from exaggerated ones.

*Id.* at 375 (internal citations omitted). In this case, there is no indication that Dr. Vicente assessed Behlman's complaints and subjective reports of her symptoms "through the objective lens of [his] professional expertise," *Mischler*, 766 F. App'x at 375 (citation omitted), as Dr. Vicente did not provide a citation to any treatment notes that supported his extreme limitations. The ALJ's decision to assign no weight to the extreme limitations found in Dr. Vicente's medical source statement was reasonable and adequately supported by the evidence of record. *See White v.*

8

*Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) (noting that it is permissible for ALJ to discount medical opinion that is based on subjective complaints).

The ALJ sufficiently summarized Behlman's treatment history throughout his decision. He specifically detailed Behlman's limited treatment with Dr. Vicente from May 2016, at the same time she applied for benefits, through May 2018. R. 39–41. The ALJ noted that Behlman presented to Dr. Vicente with subjective complaints of continued symptoms of depression and anxiety, including low mood, crying spells, insomnia, poor appetite, impaired concentration, and panic attacks, and appeared to be in mild distress with mild psychomotor agitation. Nevertheless, on her mental status exam, Behlman continually appeared to be pleasant and cooperative with good eye contact, she had good insight and judgment, her thought content was without psychotic symptoms or suicidal ideation, she had no racing thought or loosening of associations, her thought processes were logical and goal directed, and her speech was fluent and spontaneous with normal rate, tone, and volume. Dr. Vicente would adjust her medication and encourage therapy. Behlman contends that the ALJ improperly "cherry-picked" evidence from the record and overlooked the substantial evidence regarding her impairments. Although Behlman asserts that the ALJ only relied on the relatively normal mental status exams in rejecting Dr. Vicente's opinions and did not cite her consistent severe symptoms, she does not point to or cite any specific evidence she believes the ALJ overlooked. The ALJ accurately described Dr. Vicente's progress notes and properly concluded that they were inconsistent with Dr. Vicente's opinions.

The ALJ also found that Dr. Vicente's findings were not consistent with Behlman's acting as a caregiver for a friend on an extended fourteen-day trip to Costa Rica approximately six months before her hearing. R. 38, 43, 67–69, 382. Citing *Murphy v. Colvin*, 759 F.3d 811 (7th Cir. 2014), and *Harris-Glowacki v. Commissioner of Social Security*, No. 3:15-cv-395, 2017 WL 603912 (N.D. Ind. Feb. 15, 2017), Behlman asserts that the ALJ should not have referenced this trip in

9

assessing the weight to be afforded to Dr. Vicente's opinions. Both cases are distinguishable from the case at hand, however. In *Murphy*, the Seventh Circuit found the ALJ's reliance on the plaintiff's relaxing vacation to Mexico as inconsistent with symptoms caused by her earlier stroke "problematic." 759 F.3d at 817. It noted that the plaintiff testified that she "mostly laid in the sun" and that the record did not "suggest that she did any strenuous activity while on vacation." *Id.* The court concluded that, "[g]iven the limited information available on the record, such a vacation as described by Murphy would not be inconsistent with her symptoms to the point where her credibility would be diminished." *Id.* Similarly, in *Harris-Glowacki*, the court found that the ALJ did not explain the significance of the plaintiff's Florida trip as it related to the opinions of her doctors. 2017 WL 603912, at *6. The court noted that the ALJ's reliance on the trip was "problematic because the record does not indicate what the Plaintiff did during her time in Florida." *Id.*

In this case, of course, Plaintiff is claiming disability based on severe mental impairments which she claims prevent her from even getting out of bed, not the physical impairments at issue in *Murphy*. The ALJ knew that Behlman was not in Costa Rica to relax on the beach. Instead, Behlman volunteered to act as a caregiver for a friend on a fourteen-day trip to a foreign country. Although Behlman argues that she suffered anxiety during the trip, was subjected to predatory behavior, and the trip planning was undertaken by her friend's insurance company, the ALJ appropriately noted that Behlman flew to Costa Rica, had a layover in Houston, stayed in a hotel, took her friend to his hip surgery, and helped him with his recovery. The ALJ observed that Behlman's trip suggested constant change, a lot of people, and understanding, remembering, and following instructions from medical personnel. R. 42–43. The ALJ also recognized that Behlman described parts of the experience as "good" and that she indicated some parts were "bad." R. 41. Given the severity and nature of the impairment alleged and the known details of the trip, the ALJ

10

did not err in considering these facts in assessing Behlman's RFC and weighing the medical opinion evidence.

In this case, the ALJ conducted an extensive review of the record and concluded that Dr. Vicente's opinions were inconsistent with the medical records and other evidence in the record. It should also be noted that Dr. Vicente's opinion was contradicted by the opinions of the state agency medical consultants who concluded that Behlman was able to meet the requirements of unskilled work. This evidence, as well as the record as a whole, provides sufficient support for the ALJ's decision to give Dr. Vicente's extreme opinions no weight. It amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154 (internal quotation marks omitted).

Behlman further argues that the ALJ failed to apply the factors enumerated in 20 C.F.R. § 404.1527(c), including the length, nature, and extent of treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion. The fact that the ALJ was aware of and considered these factors is implicit in his description of Dr. Vicente's history of treatment and progress notes. R. 39–41. An ALJ need not explicitly address every regulatory factor in evaluating a medical opinion. *Elder v. Astrue*, 529 F.3d 408, 415–16 (7th Cir. 2008); *see also Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012). In this case, the ALJ "sufficiently account[ed] for the factors" in his decision. *Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013). That is all that is required. In sum, the ALJ gave logical reasons for affording no weight to Dr. Vicente's opinions.

## B. RFC Assessment

Behlman maintains that the ALJ's RFC assessment did not fully encapsulate the limitations caused by her mental impairments. It is well established that "[b]oth the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by

11

the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). It is important to note, however, that when a case reaches the stage of an administrative hearing, it is the ALJ who is responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c).

Under the SSA's rulings and regulations, the ALJ is required to use the "special technique" or "psychiatric review technique" to evaluate mental impairments. *See* 20 C.F.R. § 416.920a. If a claimant has an impairment that is of a severity that meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, and meets the duration requirement, the claimant is deemed disabled. 20 C.F.R. § 416.920a(d). Even if the claimant does not meet or medically equal the criteria of an impairment, when the degrees of limitation are more than "none" or "mild," the impairment is found to be severe and requires further assessment. *Id.*; SSR 96-8p, 1996 WL 374184, at *4. As SSR 96-8 explains, "[t]he mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF." 1996 WL 374184, at *4.

At steps two and three of the sequential evaluation process, the ALJ, utilizing the SSA's "special technique" for assessing mental impairments, 20 C.F.R. § 416.920a, found that Behlman had moderate limitations in interacting with others and with regard to concentrating, persisting, or maintaining pace. R. 36–37. Because her mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the ALJ concluded the "paragraph B" criteria are not satisfied. R. 37. Further assessment of Behlman's mental impairment was completed by Beth Jennings, Ph.D. and Therese Harris, Ph.D., state agency consultants; Anthony Wendorf, Psy.D., a consultative examiner; and Michael Vicente, M.D., a treatment provider. After a thorough discussion of their respective opinions and reports, the ALJ gave the opinions of Drs. Jennings and

12

Harris "great weight," the opinions of Dr. Wendorf "little weight," and the opinions of Dr. Vicente "no weight." R. 42–43. Since the ALJ gave the opinions of the state agency consultants the greatest weight, we look first to their opinions to determine whether the ALJ properly assessed Plaintiff's RFC.

Both Dr. Jennings and Dr. Harris completed Mental Residual Functional Assessment (MRFCA) forms. MRFCA forms are intended to provide the more "detailed assessment [of the claimant's mental RFC] by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF." 1996 WL 374184, at *4. The state agency consultants are instructed to first complete a "worksheet" where they are asked to rate the claimant's ability to perform certain activities by entering next to each ability described one of the following notations: "not significantly limited," "moderately limited," "no evidence of limitation in this category," or "not ratable on available evidence." Program Operations Manual System (POMS) DI 24510.060, SOCIAL SECURITY, *available at* https://secure.ssa.gov/poms.nsf/lnx/0424510060 (last visited Nov. 22, 2020). The POMS emphasizes that "**Section I is merely a worksheet** to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and **does not constitute the RFC assessment**." *Id.* (bold in original). After completing the Section I worksheet, the state agency consultant is to set out in Section III of the form in narrative format the "actual mental RFC assessment . . . explaining the conclusions indicated in Section I, in terms of the extent to which these mental capacities or functions could or could not be performed in a work setting." *Id.* The POMS states that the consultant is to indicate that a capacity is "**moderately limited**" "when the evidence supports the conclusion that the individual's **capacity to perform** the activity is **impaired**." POMS DI 24510.063 (bold in original). The POMS further notes, however, that

13

"**the degree and extent** of the capacity of **limitation** must be described in narrative format in Section III." *Id.* (bold in original).

The electronic version of the MRFCA that the state agency consultants used in this case does not clearly delineate Section I of the form from Sections II and III. But the form does contain the following instruction to the state agency consultant:

> The questions below help determine the individual's ability to perform sustained work activities. However, the actual mental residual functional capacity assessment is recorded in the narrative discussion(s), which describes how the evidence supports each conclusion. This discussion(s) is documented in the explanatory text boxes following each category of limitation (i.e., understanding and memory, sustained concentration and persistence, social interaction and adaptation). Any other assessment information deemed appropriate may be recorded in the MRFC - Additional Explanation text box.

R. 110, 135.

Dr. Jennings noted in Section I of the MRFCA form that, with respect to understanding and memory limitations, Behlman was not significantly limited in her ability to remember locations and work-like procedures and understand and remember very short and simple instructions but was moderately limited in her ability to understand and remember detailed instructions. Dr. Jennings explained in the narrative portion of her assessment that Behlman "should be able to understand, remember and carry out simple 2-3 step commands involving simple instructions but may have increasing difficulty with more complex tasks." R. 110.

As to sustained concentration and persistence limitations, Dr. Jennings noted that Behlman was not significantly limited in her ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, and complete a normal workday and workweek without interruptions from psychologically-based

14

symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. R. 110–11. She did find, however, that Behlman was moderately limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods. *Id.* Dr. Jennings explained in the narrative portion of the MRFCA that Behlman "should be able to focus to complete tasks requiring 2-3 steps but might have increasing difficulty with more complex tasks." R. 111.

As to Behlman's social interaction limitations, Dr. Jennings found that Behlman was not significantly limited in the ability to interact appropriately with the general public, ask simple questions or request assistance, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, but she found that Behlman was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors. She explained that Behlman "is able to interact appropriately with medical providers and should be capable of getting along with supervisors and coworkers with only minor conflicts." *Id.*

With respect to Behlman's adaptation limitations, Dr. Jennings found that Behlman was not significantly limited in her ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others but was moderately limited in her ability to respond appropriately to changes in the work setting. Dr. Jennings observed in the narrative portion of the form that Behlman "would be better suited for work that does not require changing tasks from day to day but rather fairly regular set of job duties and expectations." *Id.* Dr. Jennings provided the following narrative description of Behlman's MRFC: Behlman is "capable of performing and sustaining the basic mental demands of unskilled work." *Id.*

15

Like Dr. Jennings, Dr. Harris noted in Section I of the MRFCA that, with respect to Behlman's understanding and memory limitations, Behlman was not significantly limited in her ability to remember locations and work-like procedures and understand and remember very short and simple instructions but was moderately limited in her ability to understand and remember detailed instructions. Dr. Harris explained in the narrative section that, "[d]espite the above noted difficulties, [Behlman] is able to understand and remember simple instructions." R. 135.

As to Behlman's limitations in sustained concentration and persistence, Dr. Harris found that Behlman was not significantly limited in her ability to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and make simple work-related decisions. R. 136. Dr. Harris did find, however, that Behlman was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Harris explained that, "[d]espite the above noted difficulties, [Behlman] is able to maintain focus, pace and persistence for simple tasks for 2-hour periods over an 8-[hour] workday within a normal 40-hour work schedule." *Id.*

With respect to Behlman's limitations in social interaction, Dr. Harris found that Behlman was not significantly limited in her ability to ask simple questions or request assistance, get along with coworkers or peers without distracting them or exhibiting behavior extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness but was moderately limited in her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. Dr. Harris noted in the

narrative section that Behlman "is able to interact adequately with the public, manage appropriate interpersonal interactions in the workplace, and accept reasonable supervision."  R. 137.

As to Behlman's limitations in adaption, Dr. Harris found that Behlman was not significantly limited in her ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others but was moderately limited in her ability to respond appropriately to changes in the work setting.  Dr. Harris explained that Behlman "is able to recognize normal work hazards, adapt to minor changes in work demands, and manage routine work-related stress/pressures."  *Id.*

The ALJ ultimately found that Behlman had the following limitations: "the claimant must avoid all exposure to unprotected heights.  She is limited to understanding, remembering, and carrying out no more than simple instructions.  The claimant is allowed to be off task ten percent of the day in addition to regularly scheduled breaks.  She must be employed in a low stress job, defined as having only occasional decision making required and only occasional changes in the work setting.  She is limited to work where there is no production rate or pace work, such as an assembly line.  She is limited to only occasional contact with the public, coworkers, and supervisors."  R. 38.

Behlman asserts that the ALJ's RFC assessment does not sufficiently account for her moderate limitations in CPP.  Citing *DeCamp v. Berryhill*, 916 F.3d 671 (7th Cir. 2019), Behlman asserts that restricting her to simple instructions and limiting her to work where there is no production rate or pace work were insufficient to accommodate her moderate limitations in CPP.  In *DeCamp*, the state agency psychologists found moderate difficulties in concentration in a checkbox section of the MRFCA form but did not include limitations regarding concentration in their narrative conclusions.  In this case, the state agency psychologists translated their worksheet

findings by articulating work restrictions that would resolve Behlman's moderate limitations. The Seventh Circuit has explicitly recognized that, "in some cases, an ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where that narrative adequately encapsulates and translates those worksheet observations." *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015) (citing *Johansen v. Barnhart*, 314 F.3d 283, 286 (7th Cir. 2002)). In other words, when the examiner's narrative is included and is not inconsistent with the worksheet findings, the ALJ may reasonably rely on it. *See Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019) ("[A]n ALJ may reasonably rely upon the opinion of a medical expert who translates these findings into an RFC determination." (citation omitted)); *Dudley v. Berryhill*, 773 F. App'x 838 (7th Cir. 2019) (observing that plaintiff "mistakenly presumes that the psychologists' answers to the checklist section outweigh the narrative opinion section"). In short, the ALJ properly relied on the narrative statements contained in the MRFCA forms completed by Drs. Jennings and Harris, who translated their Section I findings in the narrative section of the form, and encapsulated the limitations the consultants identified in the RFC.

Behlman also asserts that the ALJ failed to support the 10% off-task limitation in the RFC because the ALJ did not articulate what evidence supported that conclusion. Behlman's argument assumes a precision that a time-off-task limitation does not allow. What Behlman fails to realize is that the ALJ's finding of an off-task limitation of up to 10% of the work day is based on his judgment as to the severity of Behlman's impairments, not a mathematical measurement. A time-off-task limitation sufficiently reflects the degree to which the ALJ concluded the claimant may be off task each day due to her impairments and allows the VE to assess whether the claimant would be able to perform full-time work. *See Finzel v. Colvin*, No. 15-C-98, 2015 WL 4877412 (E.D. Wis. Aug. 14, 2015); *Ambelang v. Colvin*, No. 12-cv-805, 2014 WL 4926191 (W.D. Wis. Sept. 30, 2014). The ALJ's 10% time-off-task limitation reflects a reasonable judgment of the

18

impact Behlman's impairments might have on her ability to work. The ALJ's RFC determination is consistent with the medical opinions offered in this case.

**C. Appeals Council**

Behlman argues that the Appeals Council failed to consider new and material evidence. The evidence consists of 18-pages of medical records from Dr. Vicente and crisis center staff from June 2018 and November 2018. A court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405.

> Evidence is "new" if it was "not in existence to the claimant at the time of the administrative proceeding." New evidence is "material" if there is a "reasonable probability" that the ALJ would have reached a different conclusion had the evidence been considered. Thus, new evidence is material only if it is relevant to the claimant's condition "during the relevant time period encompassed by the disability application under review."

*Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005) (citations omitted).

The medical records from June 2018 through November 8, 2018 (the date of the ALJ's decision) do not meet the standard for "new" evidence. Those records were generated before the ALJ issued his decision, and Behlman has not shown good cause for her failure to incorporate such evidence into the record prior to the issuance of the ALJ's decision. The remaining records at issue post-date the ALJ's decision and are therefore not material to the ALJ's decision. "[M]edical records 'post-dating the hearing' and that 'speak only to [the applicant's] current condition, not to his condition at the time his application was under consideration by the Social Security Administration' do not meet the standard for new and material evidence." *Id.* Behlman asserts that the November 2018 treatment notes are material because they "indicate that, subsequent to the hearing Behlman's anxiety and depression had escalated to the point that she was experiencing

19

active suicidal ideation." Pl.'s Br. at 22, Dkt. No. 11. Although Behlman may have experienced a downturn in her symptoms following the ALJ's decision, this evidence does not speak to her condition during the relevant time period. *See Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008) ("None of the new evidence proffered by Mr. Getch speaks to his condition at the relevant time period; it pertains only to his allegedly worsening condition in 2004 and 2005—well after the ALJ rendered his decision. If Mr. Getch has developed additional impairments, or his impairments have worsened, since his first application for benefits, he may submit a new application." (citation omitted)). Therefore, the court will not order that this evidence be reviewed by the Commissioner of Social Security.

## CONCLUSION

For these reasons, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** at Green Bay, Wisconsin this 24th day of November, 2020.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge